# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2: 04-CV-0589-RCJ-LRL |
| | ) | |
| vs. | ) | |
| | ) | |
| R.D. PRABHU, M.D. and R.D. PRABHU-LATA SHETE, M.D.'S, LTD., | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ORDER

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment on the Government's Claims that Defendants' Simple Pulmonary Stress Tests Violated the False Claims Act (#40), Defendants' Motion for Summary Judgment on the Government's Claims that Defendants' Medical Services were not Medically Necessary and Indicated (#41), and Defendants' Motion for Summary Judgment to Dismiss the Government's Claim that Defendants Were Unjustly Enriched (#42), all filed on November 9, 2005. A hearing on these motions was held on February 27, 2006. After extensive review of the record, [1] applicable law, and argument of the parties, I find that the Defendants' motion for Summary Judgment on the Government's claims that the Defendants violated the False Claims Act (#40, #41) should be GRANTED, and

---

[1] Citations to evidence presented at the oral argument or in prior written submission will be referenced using the following abbreviated citation forms: Exhibits that accompanied Defendants' Motion for Summary Judgment on the Government's Claims that Defendants' Simple Pulmonary Stress Tests Violated the False Claims Act ("Def. FCA Mem. Ex. __"); Exhibits that accompanied Defendants' Motion for Summary Judgment on the Government's Claims That Defendants' Medical Services Were Not Medically Necessary and Indicated ("Def. Med. Nec. Mem. Ex. __"); Exhibits that accompanied Defendants' Motion for Summary Judgment on the Government's Claims that Defendants' Were Unjustly Enriched ("Def. Unjust En. Mem. Ex. __"); Government Complaint ("Gov. Compl."); Government's First Amended Complaint ("First Am. Compl."); Exhibits to Dr. Prabhu's Declaration ("Dr. Prabhu Decl. Ex:__"); Exhibits that accompanied Defendants' Reply to the Government's Opposition to Defendants' Motion for Summary Judgment on the Government's Claims that Defendants' Simple Pulmonary Stress Tests Violated the False Claims Act ("Def. FCA Reply Ex:__")

that the Defendants' motion for Summary Judgment regarding the Government's unjust

enrichment claims (#42) should also be GRANTED.

## FINDINGS OF FACT

### Introduction

1.      In this False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733 (2003), action, the

Government alleged that Defendants R.D. Prabhu, M.D. and R.D. Prabhu-Lata Shete, M.D.'s,

Ltd., knowingly submitted false claims to the Government by billing for simple pulmonary stress

tests (monitored exercise in a structured setting to evaluate the patient's condition) when

performed as part of a pulmonary rehabilitation program.  *See* First Am. Compl. ¶ 13.  Defendant

R.D. Prabhu, M.D. ("Dr. Prabhu") is a Board Certified physician in both Pulmonary and Internal

Medicine.  Defendant R.D. Prabhu-Lata Shete, M.D.'s, Ltd. is Dr. Prabhu's medical practice

which is located at the Red Rock Medical Center in Las Vegas, Nevada.

2.      On May 6, 2004, the Government filed its initial complaint against Dr. Prabhu.

*See* Gov. Compl.  In the complaint, the Government alleged that during the relevant time period,

from January 1, 1998 to February 2, 2004, pulmonary rehabilitation, which consists of physical

exercises by the patient to increase the functional capacity of the patient's lungs, was not a

covered benefit under Medicare.  *See* Gov. Compl. ¶ 13.  The Government further contended that

Dr. Prabhu, knowing that pulmonary rehabilitation was not covered under Medicare, unlawfully

billed for a simple pulmonary stress test, under CPT 94620, instead. [2] *Id* at ¶ 16.

---

[2] Regulations require that physicians' services and procedures be entered onto a prescribed Governmental
form by using procedure codes published by the American Medical Association ("AMA"), known as Current
Procedural Terminology ("CPT").  *Id.* ¶ 10.  The AMA annually updates its CPT Manual to reflect both the
advances in the practice of medicine and the changes in the delivery and definition of the various medical services
and supplies.

3.      In February 2005, the Government filed its first amended complaint.  *See* First Am.

Compl.  In this complaint, the Government included two additional allegations to its initial

contentions that Dr. Prabhu breached the FCA because he billed for CPT 94620 when he

provided non-covered pulmonary rehabilitation services.  First, the Government alleged that Dr.

Prabhu did not appropriately bill for a simple pulmonary stress test under Code 94620, because a

physician could only bill for this code if he performed a pre and post-exercise spirometry and

also prepared a written physician report interpreting the results of these services.  *See* First Am.

Compl. ¶ 13.  Second, the Government contended that Dr. Prabhu failed to properly document

the medical necessity of services to some of his patients.  First Am. Compl. ¶ 14.

4.      The Amended Complaint finally contended that Dr. Prabhu had been unjustly

enriched by his allegedly unlawful behavior.  *Id.* ¶ 25.

## Regulatory Background Regarding Services In Dispute

### *Pulmonary Rehabilitation Services*

5.      There are two basic services that frame the dispute underlying the Government's

lawsuit: pulmonary rehabilitation services [3] and simple pulmonary stress tests.  "Pulmonary

rehabilitation," in essence, is a term of art that includes a number of health related programs and

procedures, all of which are designed to increase a patient's pulmonary strength that, in turn, will

improve the patient's quality of life and reduce the amount of medical resources needed to treat

---

[3] Pulmonary rehabilitation was originally described by the American College of Chest Physicians in 1974 as follows:

> Pulmonary rehabilitation may be defined as an art of medical practice wherein
> an individually tailored, multi-disciplinary program is formulated, which
> through accurate diagnosis, therapy, emotional support and education, stabilizes
> or reverses both the physical and psychopathology of pulmonary diseases and
> attempts to return the patient to the highest possible functional capacity allowed
> by the pulmonary handicap and overall life situation.

*See* Andrew L. Ries et al., *Pulmonary Rehabilitation*, 112 CHEST 1363, 1364 (Nov. 1997).

the patient's pulmonary disease.  *See Pulmonary Rehabilitation*, 112 CHEST 1363 at 1364.

Although each pulmonary rehabilitation program varies depending upon a patient's specific

needs, each program will typically include exercise, education, and monitoring the patient's

response to the program.  *See, e.g.,* Memorandum from Kathleen A. Buto, Deputy Director,

Center for Health Plans and Providers to Director, Office of Clinical Standards and Quality, Def.

FCA Mem. Ex. 4.

      6.     Medicare has long considered pulmonary rehabilitation programs to be a covered

service under the "incident to physician services" clause of the Medicare Act, 42 U.S.C.

§ 1395(x) (2003).  In 1981, the Health Care Financing Administration (now known as the

Centers for Medicare and Medicaid Services ("CMS")) Office of Coverage Policy stated that

pulmonary rehabilitation services were in fact a covered Medicare service as long as the

"reasonable and necessary" provisions indicative of all Medicare coverage are met.  *See*

American Association of Cardiovascular and Pulmonary Rehabilitation, Cardiac and Pulmonary

Issue Paper:  Cardiac & Pulmonary Rehabilitation Services, Def. FCA Mem. Ex. 5.

      7.     Various Medicare publications also demonstrate that pulmonary rehabilitation has

long been an integral part of the diagnosis and treatment of pulmonary disease.  *See, e.g.*, CMS

Outpatient Physical Therapy Manual § 253.5A, Def. FCA Mem. Ex. 6; CMS Skilled Nursing

Facility Manual 230.10C, Def. FCA Mem. Ex. 7.

      8.     In 1980, Congress established Comprehensive Outpatient Rehabilitation Facilities

("CORFs") as legitimate providers of rehabilitation services to Medicare beneficiaries.  *See* Pub.

L. No. 96-499, § 933, 94 Stat. 2609, 2637 (1980); *see also Nat'l Ass'n of Rehab. Facilities, Inc.

v. Schweiker*, 550 F. Supp. 357 (D.D.C. 1982) (describing legislation).  Congress identified

pulmonary rehabilitation as one of those covered services.  Moreover, consistent with the notion

that Medicare has always covered pulmonary rehabilitation and/or its component parts, the Government elected to incorporate pulmonary rehabilitation into the National Emphysema Treatment Trial ("NETT"), a joint National Institute of Health ("NIH") and CMS effort to study lung volume reduction surgery which began on August 1, 1997.  *See* Medicare Carrier Manual § 4900.1, Def. FCA Mem. Ex. 8.  Medicare would only cover services that were integral to the NETT study and "[n]ot prohibited from coverage by Medicare statute."  *Id.* § 4900.2.  Because pulmonary rehabilitation was considered a covered service at that time, CMS elected to reimburse pulmonary rehabilitation services under the trial.  *Id.*

9.      From 1981-2000, Medicare generally continued to pay for pulmonary rehabilitation services, especially when enunciated through fiscal intermediary Local Medical Review Policies ("LMRPs"). [4]  These LMRPs generally provided guidance to hospital outpatient departments that provided pulmonary rehabilitation services, outlining covered services, appropriate qualifying diagnoses and billing procedures.  *See* Def. FCA Mem. Ex. 9.

10.     Also, during this time period, some carriers permitted coverage for pulmonary rehabilitation by designating a specific code under which the component parts of pulmonary rehabilitation could be "bundled" into a single code. [5]

---

[4] LMRP's, which are now known as Local Coverage Determinations, set regional coverage determinations that govern in the absence of or as an adjunct to a national policy.  *See* 68 Fed. Reg. 63,692, 63,693 (Nov. 7, 2003).

[5] For example, on May 2, 1998, Empire Medicare Services ("Empire"), the Medicare carrier for New Jersey, adopted an LMRP that allowed physicians within its region to bill Medicare for outpatient pulmonary rehabilitation programs performed in a physician's office using code 94799, which is defined as "unlisted pulmonary service of procedures."  *See* LMRP – Empire Medical Services, Outpatient Pulmonary Rehabilitation Programs, #G-17B ("Outpatient pulmonary rehabilitation should be billed under CPT code 94799 and identified as outpatient pulmonary rehabilitation.  Unit billed is one per daily session"), Def. FCA Mem. Ex. 9; *see also* Medicare Xact Medicare Report, Outpatient Pulmonary Rehabilitation Programs (G-17A) (Mar. 1998) (same), Def. FCA Mem. Ex. 10; LMRP [Part B] – First Coast Service Options, Inc., Pulmonary Rehabilitation 94799 (policy originally established in 1998), Def. FCA Mem. Ex. 11; LMRP [Part B] – Palmetto GBA – OH, WV, Pulmonary Rehabilitation # 2002-33LR3 (policy originally established in 1997), Def. FCA Mem. Ex. 12.  These LMRPs also provided regional guidelines for providers when billing 94620 - the simple stress test- when performed during the course of a pulmonary rehabilitation program. *See* LMRP – Empire, Def. FCA Mem. Ex. 9.

11.     In 1998, the pulmonary medicine community (American College of Chest Physicians, American Thoracic Society, National Association for Medical Direction of Respiratory Care, American Association of Cardiovascular and Pulmonary Rehabilitation) began vigorous pursuit of the establishment of a national coverage policy for pulmonary rehabilitation to eliminate the differences among the various LMRPs that, in effect, provided different services for different Medicare beneficiaries. *See* Def. FCA Mem. Ex. 5.

12.     In March, 2000, CMS circulated a memorandum to fiscal intermediaries that declared that there is no true benefit category for pulmonary rehabilitation programs. At the same time, CMS continued to assert that component parts of pulmonary rehabilitation programs may be appropriately billed under some circumstances:

> In some instances, Medicare may make payment under separate benefits for certain individual services such as certain physical or occupational therapy services that could be reasonable and necessary, assuming all other coverage criteria for physical or occupational therapy services were met.  Some other services defined as components of pulmonary rehabilitation could be considered physician evaluation and management services under existing codes for physician services.

Memorandum from Kathleen A. Buto, Deputy Director, Center for Health Plans and Providers to Director, Office of Clinical Standards and Quality (Mar. 3, 2000).  *See* Def. FCA Mem. Ex. 4.

13.     Consistent with this CMS pronouncement, some carriers began to revise their policies to clarify that although pulmonary rehabilitation may no longer be covered, its component services may be covered.  For example, on April 2, 2001, Empire deleted its May 2, 1998, LMRP, *see supra* note 5, and informed its regional providers that they should no longer use 94799 to bill for pulmonary rehabilitation, but listed fifteen other codes as "some" of the codes that providers could use to bill for the "components of pulmonary rehabilitation which

represent the actual service[s] rendered." *See* Medicare News Brief – New Jersey at 3 (Apr. 2001), Def. FCA Mem. Ex. 13.

14.     Moreover, consistent with the Government's recognition that pulmonary rehabilitation was medically necessary and appropriate, in late 2001, CMS published, as part of its hospital outpatient prospective payment update, new billing codes to be used primarily by respiratory therapists providing certain pulmonary rehabilitation services providing pulmonary-rehabilitation related services. Specifically, on November 1, 2001, CMS published an interim final rule which introduced three new "G" codes which providers could use to bill for respiratory therapy services. [6]

15.     On December 31, 2002, CMS published comments and corresponding responses generated through the publication of the interim final rule regarding the G codes. 67 Fed. Reg. 79,966, 79,999 (Dec. 31, 2002). In its responses, CMS pointed out that the codes were necessary to provide more "specificity about the [pulmonary rehabilitation] services being delivered" and that the physicians could perform these services in an office setting:

> *Comment*: Commentators asked whether respiratory therapists would be precluded from using additional CPT codes to bill for their pulmonary-rehabilitation related services.

---

[6] CMS acknowledged that the new G codes were necessary because "[i]n the past, services delivered by respiratory therapists or other health professionals often have not been clearly described by existing CPT codes." 66 Fed. Reg. 55,246, 55,311 (Nov. 1, 2001). Thus, the new G codes were being introduced "[i]n order to clarify coding of these services . . . ." *Id.* The new G codes were:

> G0237 Therapeutic Procedures To Increase Strength or Endurance of Respiratory Muscles, Face to Face, One on One, Each 15 Minutes (including monitoring).

> G0238 Therapeutic Procedures To Improve Respiratory Function, Other Than Those Described by G0237, One on One, Face to Face, per 15 Minutes (including monitoring).

> G0239 Therapeutic Procedures To Improve Respiratory Function, Two or More Patients Treated During the Same Period, Face to Face (includes monitoring).

*Id.*

> *Response*:  We reiterate that codes G0237, G0238, and G0239 were
> developed to provide more specificity about the services being
> delivered . . .

*Id.* at 79,999-80,000.

16.     There is no dispute regarding these facts.  The Government's own expert concurs that the Government covered pulmonary rehabilitation services in different settings and in different jurisdictions.  *See* Deposition of Dr. MacIntyre,14:1-16:17 (hereinafter "Dr. MacIntyre Dep."), Def. FCA Mem. Ex. 1 (pulmonary rehabilitation covered in comprehensive rehabilitation facilities, as part of the National Emphysema Treatment Trial, under the "G" Codes, and under some carrier LMRP).  Further, both the Government's expert and the carrier's Medical Director concur that Medicare has always covered the component parts of pulmonary rehabilitation – such as pulmonary stress tests.  *See* Dr. MacIntyre Dep. at 16:6-10;  *see also*, Deposition of Dr. Mangold, 25:3-20 (hereinafter "Dr. Mangold Dep."), Def. FCA Mem. Ex. 2.  Dr. Mangold, the carrier's Medical Director, additionally confirmed that it never issued a LMRP that prohibited physicians from billing for pulmonary rehabilitation or its component services.  *See* Dr. Mangold Dep. at 12:4-14; 14:5-17.

### *Pulmonary Stress Tests*

17.     In 1991, the AMA defined CPT Code 94620 as follows:

**94620** Pulmonary stress testing, simple or complex

*Current Procedural Terminology*, Fourth Edition, American Medical Association (1991), Def. FCA Mem. Ex. 14.  At this point, there was no express indication that a pre and post-exercise spirometry or a written physician report is required.

18.     The record reflects that in 1998, the AMA, through its publication, the CPT ASSISTANT, which provides guidance to the physician community regarding the proper scope and

interpretation of the CPT, announced that Code 94620 would again be revised to distinguish between two common types of pulmonary stress tests: one which would include spirometry and one which would not:

> Code 94620 was revised to more accurately distinguish the two types of pulmonary stress testing. Code 94620 includes a simple exercise test performed with a baseline spirogram, in which the patient walks on a treadmill until dyspnea occurs, with a repeat spirogram obtained for the evaluation of exercise-induced bronchospasm. This procedure may alternatively be performed to include a six-minute walk to evaluate distance, dyspnea, oxyhemaglobin desaturation, and heart rate. This test is usually repeated after a rest period. However, this additional testing when performed is considered inclusive and does not alter the reporting of code 94620. Physician analysis of data and interpretation of the test are procedurally inclusive components of this code.

Coding Changes, Review of 1999 CPT, CPT ASSISTANT, Nov. 1998:35, Def. FCA Mem. Ex. 15.

19.     Consistent with the 1998 announcement, the CPT was revised in 1999 to contain the following descriptor for Code 94620:

> Pulmonary stress testing; simple (**e.g., prolonged exercise test for bronchospasm with pre and post-spirometry**).

CURRENT PROCEDURAL TERMINOLOGY 1999 (emphasis supplied), Def. FCA Mem. Ex. 16.

20.     The record further reflects explanatory comments published at the same time in the CPT ASSISTANT. The CPT ASSISTANT sets forth Vignettes that are intended to guide practitioners regarding circumstances under which they may properly bill Codes identified in the CPT. *See* Current Procedural Terminology (CPT) Assistant, Pulmonary Testing Function, American Medical Association. Def. FCA Mem. Ex. 18. Notably, one of the two Vignettes describing CPT Code 94620 expressly does not include a pre and post-exercise spirometry. Specifically, the CPT ASSISTANT provides the following two Vignettes:

> **Vignette #1**: A 65-year old woman is seen because of dyspnea and cough after walking several city blocks. She has a normal physical

examination and a spirogram is normal.  A simple exercise test is performed with baseline spirogram.  She walks on a treadmill until dyspnea occurs and a repeat spirogram is obtained to evaluate for exercise induced bronchospasm.

**Vignette #2**:  A 65-year-old woman with documented COPD is evaluated for entrance into a pulmonary rehabilitation program.  A six minute walk is performed to evaluate distance, dyspnea, oxyhemoglobin, desaturation and heart rate.  The test is usually repeated after a rest period to eliminate learning bias (but reported as one test).

*Id.*

21.     The undisputed facts indicate that the services that Dr. Prabhu provided to his patients during pulmonary rehabilitation treatment sessions are consistent with those described in Vignette #2: patients received a walk test to evaluate distance, dyspnea, oxyhemoglobin, and heart rate.  *See*, *e.g*., Aff. of Darrall Mitz ¶ 7, Def. FCA Mem. Ex. 19; Aff. of Teida Cark ¶ 9, Def. FCA Mem. Ex. 36; Aff. of Adiba Schiefer ¶ 11, Def. FCA Mem. Ex. 38.

22.     The record also reflects that the CPT ASSISTANT recently confirmed that pre and post-exercise spirometry is not required when billing for a simple stress test.  There, in response to a question regarding whether a spirometry must be performed to bill for a pulmonary stress test, the CPT ASSISTANT reaffirmed that it does not:

**Question**:  A physician performs a 6-minute walk on a patient to assess oximetry, heart rate, dyspnea, and distance reached in 6 minutes.  The physician analyzes the data and interprets the test results.  If the physician does not perform a spirometry as a baseline for the procedure, is it still appropriate to report code 94620.

**AMA Comments**:  From a CPT coding perspective, code 94620, *Pulmonary stress testing; simple (eg, prolonged exercise test for bronchospasm with pre-and post-spirometry),* may be reported to describe the procedure.  Code 94620 includes a simple exercise test performed with a baseline spirogram, in which the patient walks on a treadmill until dyspnea occurs, with a repeat spirogram obtained for the evaluation of exercise-induced bronchospasm.  This procedure may alternatively be performed to include a 6-

minute walk to evaluate distance, dyspnea, oxyhemoglobin desaturation, and heart rate. This test is usually repeated after a rest period. However, this additional testing when performed is considered inconclusive and does not alter the reporting of code 94620. Physician analysis of data and interpretation of the test are procedurally inclusive components of this code. Therefore, code 94620 may be reported if either of the testing methods are performed.

Coding Consultation: Questions and Answers, CPT Assistant, Mar. 2004:10, Def. FCA Mem. Ex. 20. [7]

23.    The latest explanatory guidance in the CPT Assistant conclusively contradicts the proposition that billing for CPT Code 94620 requires a pre and post-exercise spirometry. Indeed, even the Government's own expert concurred. Specifically, after being asked to review the Government's operative complaint and state whether he agreed or disagreed that CPT 94620 required any pre and post-exercise spirometry, Dr. MacIntyre stated that he believed it was not mandated. *See* Dr. MacIntyre Dep. at 11:10-12:2, Def. FCA Mem. Ex. 1.

**Reasonable Persons Can Disagree About Billing Requirements**

24.    The parties' various contentions demonstrate that at a minimum, reasonable persons can disagree regarding the billing requirements underlying pulmonary rehabilitation and

---

[7] In 2005, the CPT Assistant again clarified that no pre and post-exercise spirometry was required to bill for CPT 94620:

> **Question**: In reference to this March CPT Assistant Q&A, our question concerns the word *alternatively* in the answer statement. Specifically, does this mean that a baseline and repeat spirogram are not required when the alternative 6-minute walk test is performed? Our interpretation is that it is appropriate to report code 94620 when a 6-minute walk test is performed to evaluate distance, dyspnea, oxyhemoglobin desaturation, and heart rate even though no pre- and post-spirometry performed. Is our interpretation correct.

> **AMA Comments**: Yes, your interpretation is correct. A 6-minute walk test is appropriately reported with code 94620. **Spirometry is not required for the reporting of code 94620 with a 6-minute walk test.**

Coding Consultation: Questions and Answers, CPT Assistant, July 2005:13 (emphasis added), Def. FCA Mem. Ex. 21.

simple stress tests.

25.     The record indicates that Medicare has failed to issue specific guidance regarding the precise type of documentation that must exist to document the provision of pulmonary rehabilitation or the provision of a simple stress test.  *See* Dr. Mangold Dep. at 23:2-6 ("Q.Are you aware of any particular guidance that Nevada Part B has issued that requires a prescribed physician interpretation of some form to exist in order to bill for 94620?  A. No."); *see also* Dr. MacIntyre Dep. at 26:25-27.

26.     The record also specifies that there is no physician written requirement for purposes of documenting CPT 94620 claims.  *See* Deposition of Scott Manaker at 76:10-14 (hereinafter "Dr. Manaker Dep."), Def. FCA Reply Ex. A.  ("Q. With respect to documentation of 94620, is it your opinion that the code requires a specific type of physician written interpretation?  A. No.").

27.     Indeed, a number of facts demonstrate the general confusion regarding the appropriate circumstances under which a physician could bill for a simple stress test.  First, the Government and its own expert disagree regarding the extent that pulmonary rehabilitation has historically been covered by Medicare.  *See* ¶¶ 6-16.  Second, the Government and its own expert disagree regarding whether a pre and post-exercise spirometry is required to bill under CPT 94620.  *See* ¶¶ 17-23.  Third, the Government's lead medical reviewer, Carol Whitby, and the carrier Medical Director, Dr. Mangold, both misread the CPT ASSISTANT to require a pre and post-exercise spirometry when the CPT ASSISTANT itself clarified that no such requirement existed.  *See* Deposition of Carol Whitby at 57:12-64:5 (hereinafter "Whitby Dep."), Def. FCA Mem. Ex. 17; Dr. Mangold Dep. at 18:22-22:14.  Fourth, the Government's lead medical

reviewer, Ms. Whitby, approved several of Dr. Prabhu's claims under CPT 94620 that did not

include a pre and post-exercise spirometry and prescribed physician report that should have been

disapproved if the Government's allegations had any merit.  *See* Whitby Dep. at 28:1-35:5.

Fifth, Ms. Whitby confessed that even after completing her written review of Dr. Prabhu's

medical records that a "fair characterization" would be that she still did not know "everything

that a pulmonary stress test entailed" and that even trained certified coding specialists, such as

herself, can legitimately experience confusion when choosing an appropriate code.  *Id*. at 48:2-6,

55:7-16.  Sixth, Dr. Mangold, the carrier Medical Director, when asked whether the governing

guidance was ambiguous conceded that "yeah, I would agree with that."  Dr. Mangold Dep. at

22:11-14.  Seventh, the Government's own expert, Dr. MacIntyre, admitted that "there's lots of

confusion in this area."  Dr. MacIntyre Dep. at 33:20-23.

### Medicare Instructed Dr. Prabhu to Bill for Simple Stress Tests When Providing Pulmonary Rehabilitation Sessions

28.    Beginning in the early 1990's, Dr. Prabhu and his staff, on multiple occasions,

reached out to his carrier to receive instructions regarding billing for the pulmonary stress tests

he provided to patients.  The record is replete with undisputed evidence of these

communications.

29.    In approximately August, 1991, a representative from the Medicare carrier visited

Dr. Prabhu's clinic.  *See* Aff. of Dennis Falls, ¶¶ 5-8  (hereinafter "Falls Aff."),  Def. FCA Mem.

Ex. 22. [8]  The carrier visited to review Dr. Prabhu's billing charts and medical records and to

answer any billing questions he, his physicians, or his employees asked.  *See* McKeon Aff., ¶ 4;

---

[8] *See also,* Aff. of Judy Kanizai, ¶¶ 3-5 (hereinafter "Kanizai Aff."), Def. FCA Mem. Ex. 23; Aff. of
Maureen McKeon, ¶¶ 4-7 (hereinafter "McKeon Aff."), Def. FCA Mem. Ex. 24; Aff. of Dr. Michael Schlacter, ¶¶ 4-
10 (hereinafter "Schlacter Aff."), Def. FCA Mem. Ex.25; Aff. of Beverly Nelson, ¶ 4 (hereinafter "Nelson Aff."),

Schlacter Aff., ¶ 4; Nelson Aff., ¶ 4.  During that visit, Dr. Prabhu described the pulmonary rehabilitation services he provided.  *See* Falls Aff., ¶¶ 6-8; *see also* Mitz Aff., ¶¶ 5-7.  While describing the pulmonary rehabilitation services, Dr. Prabhu walked the carrier representative through the pulmonary lab area so he could show her first hand the exercise and monitoring equipment he used during a pulmonary rehabilitation session.  *See* Falls Aff., ¶¶ 6-8.  After touring the pulmonary lab and hearing the services described, the carrier representative identified several codes and instructed Dr. Prabhu to use those codes when billing Medicare for pulmonary rehabilitation services.  One of those codes was 94620, the code for a simple stress test.  *Id*; *see also* Schlacter Aff., ¶¶ 8-9; McKeon Aff., ¶¶ 5-7.  The carrier representative instructed Dr. Prabhu that 94620 satisfied the description for the monitored exercise portion of the pulmonary rehabilitation services he provided.  After the carrier's visit, Dr. Prabhu began scheduling pulmonary rehabilitation sessions for his Medicare patients.  *See* Mitz Aff., ¶ 9.

30.     By 1992, Dr. Prabhu's medical and billing records – records that, as will be described below, were under intense scrutiny by the Government – clearly identified a "pulmonary rehabilitation program" as a service being provided by Dr. Prabhu.  *See* 10/22/92 Lung Institute of Nevada Pulmonary Function Scheduling Form, Def. FCA Mem. Ex. 30.  Thus, the record indicates that as early as 1992, the Government had a basis to know that Dr. Prabhu was providing pulmonary rehabilitation services and that he was billing Medicare for the component parts of those services.  *See id.*

31.     The Government's own work papers reveal that it was aware of previous education that Dr. Prabhu had received from Aetna, the Government Medicare carrier during this time period.  *See* Deposition of Cindy Hicks at 28:1-25, 54:24-55:8, Def. FCA Mem. Ex. 31.

---

Def. FCA Mem. Ex. 26; Mitz Aff., ¶¶ 4-10; Dep. of Siuresh Khilnani at 8:20-10:20(hereinafter "Khilnani Dep."),

32.     Even after the initial contact with the carrier, Dr. Prabhu's staff continued to make inquiries to Medicare and its representatives regarding the proper coding for pulmonary rehabilitation services. [9]

33.     The stress test billings as part of the pulmonary rehabilitation services continued through 1994, 1995, and 1996. *See* McKeon Aff., ¶¶ 6-7; Aff. of Kim Brown, ¶ 6 (hereinafter "Brown Aff."), Def. FCA Mem. Ex. 33. In 1997, the carrier again informed Dr. Prabhu that he was authorized to bill Medicare for a simple stress test when performed as a component part of a pulmonary rehabilitation session. [10] Moreover, Medicare continued to approve payments for the simple stress tests that were given during a patient's pulmonary rehabilitation program.

34.     In 1998, as the simple stress test billings continued, Dr. Prabhu retained Silverwood Management Group ("Silverwood") to process his billing claims, including his Medicare claims. *See* Aff. of Robert Kinkade, ¶ 9 (hereinafter "Kinkade Aff."), Def. FCA Mem. Ex. 35. Dr. Prabhu chose Silverwood because it had a reputation as a company that employed claims processors who were competently trained and sufficiently experienced to review the

---

Def. FCA Mem. Ex. 27.

[9] For example, in 1993, Dr. Prabhu's billing supervisor, DeAnna Sulzinger, traveled to Phoenix, Arizona, to visit with Ms. Sonja Campbell, the Provider Relations/Claims Representative for the Medicare carrier. *See* Aff. of Deanna Sulzinger, ¶ 9 (hereinafter "Sulzinger Aff."), Def. FCA Mem. Ex. 32. Ms. Sulzinger's discussions with Ms. Campbell focused, in large part, on the pulmonary function tests ("PFT") billings that were being performed in Dr. Prabhu's pulmonary lab, including the PFT billings that were used to monitor the pulmonary rehabilitation patients. *Id.*, ¶ 11. Ms. Sulzinger recalls describing the pulmonary rehabilitation services to Ms. Campbell, including the monitoring component of the services, such as the simple stress test. *Id.*, ¶ 10. After providing the description, Ms. Sulzinger was informed that she could use the simple stress test code when billing for the pulmonary rehabilitation services. *Id.* Although there were questions and issues surrounding various other PFT billing issues, the carrier representative never questioned how pulmonary rehabilitation services were being performed or billed. *Id.*, ¶¶ 10-11.

[10] The confirmation that he was correctly billing the simple stress test component of pulmonary rehabilitation services occurred during a telephone conversation between Ms. Atkins, Dr. Prabhu's respiratory therapist, and the carrier. Ms. Kim Williams, Dr. Prabhu's former Billing Supervisor, was present with Ms. Atkins during that conversation. At that time, Ms. Atkins specifically referred to "pulmonary rehab classes," when describing the various services being provided. *See* Atkins Aff., ¶¶ 8-11; Aff. of Kim Williams, ¶¶ 4-6 (hereinafter "Williams Aff."), Def. FCA Mem. Ex. 34. After listening to the description of the "pulmonary rehab classes" the carrier instructed Ms. Atkins that it was appropriate to bill Medicare using code 94620, the code for a simple stress test. *Id.*

claims before submission to confirm that the claims were accurately coded and that Medicare

covered the services.  *Id*. ¶¶ 6-8.  After retaining Silverwood as his claims processor, Dr. Prabhu

decided to revise his standard bill yet again. [11]

35.     Medicare's approval of simple stress test billings as a component part of

pulmonary rehabilitation came from other sources as well during that time.  In 1998, Ms. Kim

Williams, Dr. Prabhu's former billing manager, attended a seminar Medicare conducted in

Phoenix, Arizona.  *See* Williams Aff., ¶ 7.  Medicare scheduled the seminar to discuss billing and

coding issues with Medicare providers and their staff.  One of the seminar's sessions allowed for

a question and answer period by a panel of speakers from Medicare.  During that session, one of

the attendees sought advice from the Medicare panel as to which codes to use when billing for

pulmonary rehabilitation services.  The attendee described the pulmonary rehabilitation services

in a manner that was the same as the pulmonary rehabilitation services that Dr. Prabhu provided.

*Id*. ¶ 8.  After describing the services, the attendee asked whether the code for a simple stress test

could be used to bill for a part of the pulmonary rehabilitation services.  The entire panel

concurred that it was appropriate to bill for a simple stress test performed as part of pulmonary

rehabilitation.  *Id*.

36.     The record indicates that from 1999 into 2004, Dr. Prabhu continued to bill

Medicare for the simple stress tests that were performed to monitor patients during their

pulmonary rehabilitation session.  *See, e.g.*, Clark Aff., ¶¶ 7-12.  Consistent with the years from

---

[11] During the revision process, Ms. Teida Clark, a Silverwood employee, contacted the Medicare carrier to
discuss various billing and coding issues, including the billings for the simple stress tests that were performed as a
component part of the pulmonary rehabilitation services.  *See* Aff. of Teida Clark, ¶ 7 (hereinafter "Clark Aff."),
Def. FCA Mem. Ex. 36.  Although Ms. Clark cannot recall the specifics of the discussions, she does know that if the
carrier had not approved the simple stress test billings, she would have immediately ceased submitting any future
claims for the simple stress tests when performed as a component part of pulmonary rehabilitation.  *Id.*, ¶ 8.

1991 through 1998, from 1999 to 2004, Medicare approved Dr. Prabhu's simple stress test claims without question.

37.     Based upon inquiries received from the Government's program integrity carrier in 2003, Dr. Prabhu, and his billing staff, began to realize, for the first time, that there might be some question or problem related to his 94620 billings.  As a result, he instructed his billing staff to yet again contact the carrier to discover whether any problems existed regarding his simple stress test billings.  The carrier again informed Dr. Prabhu that his billing of 94620 was proper and that he could bill 94620 once per day per patient within the pulmonary rehabilitation setting. *See* Clark Aff., ¶¶ 9-12; *see also* Dep. of Teida Clark at 17:19-19:10, 24:5-27:5 (hereinafter "Clark Dep."), Def. FCA Mem. Ex. 37.

38.     Notwithstanding the carrier's advice, on February 2, 2004, Dr. Prabhu received a letter from the United States Attorneys Office alleging that he was violating the FCA by performing pulmonary rehabilitation and billing for a pulmonary stress test.  Upon receipt of that letter, Dr. Prabhu's agents again inquired of the carrier regarding whether there were any problems with his stress test billings and were told that they were billing correctly. *See* Clark Dep. 24:5-27:13; Clark Aff. ¶ 10.

39.     The evidence indicates that Dr. Prabhu made one final attempt to seek the carrier's advice on this issue.  On May 10, 2004, Ms. Teida Clark, Dr. Prabhu's Billing Supervisor, in the presence of Adiba Schiefer, one of her claims processors, again called the carrier to ask whether simple stress tests could be billed within the context of pulmonary rehabilitation services.  After hearing a description of the services, the carrier told Ms. Clark that 94620 was correctly being billed. *See* Clark Aff., ¶ 12; *see also* Aff. of Adiba Shiefer, ¶¶ 10-14 (hereinafter "Schiefer Aff."), Def. FCA Mem. Ex. 38.  The carrier also informed Ms. Clark that

the simple stress test could be billed within the pulmonary rehabilitation setting once per day per patient.  *See* Clark Aff., ¶ 12.  When asked whether the carrier was willing to confirm its advice in writing, it declined to do so.  *Id.* ¶ 14.

40.     To summarize, the undisputed facts reflect that for thirteen years Medicare advised Dr. Prabhu that he was allowed to bill for the simple stress test component of pulmonary rehabilitation services.

**The Medical Necessity Of Dr. Prabhu's Claims**

41.     In its amended complaint, the Government alleged that the pulmonary rehabilitation services provided by Dr. Prabhu were "not medically indicated and necessary for the patients involved, because no further improvement in lung function could reasonably be expected for those patients at the time the services were rendered."  *See* First Am. Compl. ¶ 14. In this regard, the Government contended that the certifications made on Form HCFA 1500 (that the services provided were medically reasonable and necessary) were false.  *Id.*

42.     The record is replete with evidence of the medical necessity of the pulmonary rehabilitation services given to Dr. Prabhu's patients. [12]  To be admitted into Dr. Prabhu's pulmonary rehabilitation program, patients must have various types of respiratory diseases such as chronic obstructive lung disease ("COPD"), emphysema, chronic bronchitis, persistent asthma or other type of chronic respiratory system impairment that limit exercise and their ability to engage in activities of daily living- such as brushing their teeth, taking a shower or preparing

---

[12] Dr. Prabhu's Declaration included excerpts from the records of fourteen patients.  *See* Dr. Prabhu Decl., ¶¶ 7-79.  Each excerpt refers to patient diagnoses as well as the reasons that pulmonary rehabilitation therapy was medically necessary and indicated.  The record reflects patient improvement in each case, a result of the pulmonary rehabilitation therapy.  *See also*, Decl. of Clement Y., Osei, M.D., ¶ 6 (hereinafter "Dr. Osei Decl."), Dr. Prabhu Decl. Ex. 9; Decl. of Paul A. Stewart, M.D., ¶ 4 (hereinafter "Dr. Stewart Decl."), Dr. Prabhu Decl. Ex. 4.; *see also* Dep. of Scott Manaker, M.D., Ph.D. at 64:14-65:11 (hereinafter "Dr. Manaker Dep."), Def. Med. Nec. Mem. Ex. 8.

their food.  *See* Deposition of Rachakonda D. Prabhu, M.D., at 23:20-24:10 (hereinafter "Dr.

Prabhu Dep."), Def. Med. Nec. Mem. Ex. 1.  Even as to the diagnoses listed above, however, Dr.

Prabhu did not admit all patients who had been diagnosed with respiratory disease.  Rather, only

a very small percentage of patients were admitted that, among other things: (1) exhibited

disabling symptoms which significantly impaired the patient's level of functioning, (2) was

physically able and motivated to participate; and (3) was expected to demonstrate measurable

improvement.  *See generally id.*, at 23:18-28:19.

43.    Dr. Prabhu provided patients admitted to his pulmonary rehabilitation program

with each of the component parts of pulmonary rehabilitation - education, exercise, and

monitoring.  As part of the education component, a multidisciplinary team of health care

professionals educated patients regarding the anatomy of the disease, the pathology of the

disease, and the pharmacology of the disease.  *Id.* at 26:1-28:19.  As to the exercise component,

Dr. Prabhu exercised the patients on a treadmill, hand ergometer and bicycle.  *See generally id.* at

40:4-40:23.  As to monitoring the patient, a professional, certified respiratory therapist and/or Dr.

Prabhu would be physically present during the exercise to monitor the patient's dyspnea

(shortness of breath), oxyhemoglobin desaturation and heart rate and to document and measure

the patient's performance to determine whether the patient was making progress toward the

ultimate goal of assisting the patient obtain the highest possible level of independent function.

*Id.* at 48:6-49:2.

44.    After each session, Dr. Prabhu would review the respiratory technician's

comments, as well as the time, distance, and how many machines were used.  He would then

compare those results to the patient's prior sessions to evaluate the patient's condition in the

context of the patient's diagnosis.  Dr. Prabhu Dep. at 48:6-49:2.  Based upon that review, Dr.

Prabhu decided whether the patient needed another test or another session and would document his findings accordingly. *Id.* In providing pulmonary rehabilitation sessions, Dr. Prabhu's goal was for the patient to obtain the highest possible level of independent function. *Id.* at 35:15-35:20.

45.     Moreover, even the Government itself did not assert that Dr. Prabhu provided ineffective or worthless services to his patients. Dr. MacIntyre, the Government's own expert, for example, and a professor of Medicine at Duke University Medical Center, agreed that "[e]xercise therapy is a major component of a pulmonary rehabilitation process that is effective in improving function and quality of life [for] patients." Gov't Expert Report of Dr. Neil MacIntyre. Additionally, after reviewing Dr. Prabhu's patient care records from 1/1/99 to 2/2/04, Dr. MacIntyre ultimately opined that "[e]xercise therapy [was] … medically appropriate therapy" for Dr. Prabhu's patients. *Id.*

46.     A second Government expert, Deborah Grider, however, opined that some services provided to a very small percentage of Dr. Prabhu's patients were not appropriately *documented* as medically necessary. *See* Deposition of Deborah Grider (hereinafter "Grider Dep."), Def. Med. Nec. Mem. Ex. 5. Specifically, Ms. Grider opined that as to the 254 patients that received pulmonary stress tests during the time period, that 14 patients, or 5.5% of the total, received pulmonary rehabilitation services that were not sufficiently documented in the medical record.

47.     To determine the appropriate documentation standard to determine whether the pulmonary rehabilitation sessions were appropriately documented, Ms. Grider used a California LMRP, because Nevada did not have any controlling standard. *See* Grider Dep. at 20:8-25. Both Ms. Grider and the Nevada carrier Medical Director, Dr. Mangold, state in the record, however,

that the California LMRP would never dictate how a Nevada physician should document his

service. [13]

48.     Although Ms. Grider opined regarding the documentation standard applicable to a

small percentage of Dr. Prabhu's patients, she expressly disclaimed the ability to opine regarding

whether services were clinically medically necessary and indicated, because she lacks formal

medical training and is not a physician.  *See* Grider Dep. at 37:24-38:4; 59:2-5 ("Q.  But you

certainly don't agree with his clinical opinion in here?  A.  Clinically, I can't – I can't agree or

disagree.  I'm not a physician"); *see also id.* at 66:7-13; 88:17-21 ("Q.  What was the specific

issue you were requested to opine upon?  A.  I was asked to give my opinion regarding medical

necessity, documented medical necessity, not clinical medical necessity").

49.     Thus, the only issue here is not whether the services were in fact provided or

whether they were clinically medically necessary and indicated and benefited the patient but only

whether the services provided to fewer than 5.5 percent of all relevant patients should have been

documented differently. [14]  Ms. Grider stated in the record that general documentation

guidelines, such as the 1997 Evaluation and Management Services guidelines, should govern the

documentation of the services in dispute in this lawsuit.  The same record reflects that those

---

[13] For example, when asked whether she would "ever inform a client that guidelines from another state are binding on that client," Ms. Grider expressly stated that "[n]o, I would not."  Grider Dep. 25:18-21.  Similarly, Dr. Mangold, when asked whether "guidance issued by Fiscal Intermediaries Part A [is] ever binding with respect to Part B providers and suppliers," responded "[n]ever."  Dr. Mangold Dep. at 36:16-20.

Part A of Medicare authorizes payments primarily for "inpatient hospital services, nursing home and hospice care and, in some instances home health services."  *See* 42 U.S.C. § 1395c-1395i-4; *see generally United States ex rel. Drescher v. Highmark, Inc.*, 305 F. Supp. 2d 451, 453-54 (E.D. Pa. 2004).  Part B of Medicare, which is relevant here, pays for physicians' services, outpatient hospital services, and certain durable medical equipment.  *See* 42 U.S.C. § 1395j-1395w-4.  CMS contracts with private companies to handle claims processing responsibilities.  Private insurance companies that process the bulk of Medicare Part B claims are referred to as carriers and private insurance companies that process the bulk of Medicare Part A claims are known as fiscal intermediaries.  *See Highmark*, 305 F. Supp. 2d at 454 (describing programs).

Guidelines are satisfied even if the service provided is not documented as long as "the rationale for ordering diagnostic and other ancillary services [are] easily inferred." *See* 1997 Documentation Guidelines for Evaluation and Management Services, Def. Med. Nec. Mem. Ex. 7.

50.     There is no dispute that services were provided and those services were clinically medically necessary and indicated.  There is, for example, no allegation that Dr. Prabhu fabricated the hospital (or other medical) records documenting how extremely ill the patients were or that he did not provide pulmonary rehabilitation services to these acutely ill patients. There is also no dispute that neither the Nevada carrier nor CMS had issued any guidelines regarding how to document the monitored exercise furnished as part of a pulmonary rehabilitation program.

### Dr. Prabhu Lost Substantial Money in Providing Pulmonary Rehabilitation To His Patients

51.     Finally, the unrebutted evidence shows that Dr. Prabhu lost substantial money in providing pulmonary rehabilitation to his patients but provided these services because of the substantial health benefit his patients obtained.  *See* Def. Unjust En. Mem ¶¶ 6-10.

52.     Specifically, the record reflects that certified public accountant, George C. Swarts, examined all payments the clinics received from patients, their private insurers, and Medicare during 2002 and 2003.  The practice received $122,399.83 in payments in 2002 and $74,594.43 in 2003.  The collected revenue during these two years was $196,994.26.  *See* Expert Reports of George C. Swarts at Ex. 3, p. 1 (hereinafter "Swarts Ex. Report"), Def. Unjust En. Mem. Ex. 5.

---

[14] Ms. Grider stated that other than the patients she opined received services that were not appropriately documented (that is, the 5.5%), the remainder of patients had services that were appropriately documented (that is, the remaining 94.5%).  *See* Grider Dep. at 20:5-7.

53.     However, the practice's costs exceeded this revenue.  Specifically, Mr. Swarts determined the practice's costs by examining its direct costs (such as purchases & supplies; payroll & payroll expenses; health insurance) and its indirect costs (such as utilities for power and phone; rent; malpractice insurance).  The total costs were $226,803.03 in 2002 and $198,104.75 in 2003.  *See* Swarts Ex. Report.  Consequently, the analysis demonstrates that as a result of furnishing pulmonary rehabilitation services, Dr. Prabhu's practice lost approximately $104,403 ($122,399.83 in payments versus $226,803.03 in expense) in 2002 and approximately $123,510 ($74,594.43 in payments versus $198,104.75 in expense) in 2003.  *Id.*

54.     In February 2004, as a direct result of this lawsuit, Dr. Prabhu ceased providing pulmonary rehabilitation to his patients.

**The Government's Criminal and Civil Fraud Investigation During the 1990's**

55.     During the 1990s, Dr. Prabhu was the target of an ongoing criminal investigation. As part of the investigation, Dr. Prabhu's Medicare claims were being closely reviewed, including his "PFT" claims, such as the simple stress test.  *See, e.g.,* Sulzinger Aff., ¶ 5.

56.     Active in that investigation was the Federal Bureau of Investigation, the Health and Human Services Office of Inspector General ("OIG"), and the State of Nevada's Medicaid Fraud Control Unit ("MFCU").  (All three investigations are hereinafter collectively referred to as the "Criminal Investigation").  *See* Def. FCA Mem. ¶ 56.

57.     During the Criminal Investigation, Dr. Prabhu's Medicare and Medicaid medical records and corresponding billing claims were placed under extreme scrutiny.  *See, e.g.,* Sulzinger Aff., ¶ 5.  For example, the FBI recruited potential witnesses to wear body wires so they could secretly record their conversations with Dr. Prabhu.  *See* Memorandum from Edward Jenkins, Acting Special Agent, FBI to Leland Lufty, Acting United States Attorney, Def. FCA

Mem. Ex. 40.  Dr. Prabhu's telephone lines were tapped and his conversations recorded.  *Id*.  The

FBI, alone, conducted at least forty-two witness interviews seeking information about Dr.

Prabhu's billing practices.  *See* Witness Summary, Def. FCA Mem. Ex. 41.

58.  By October, 1992, Dr. Prabhu was the target of a grand jury investigation into his

Medicare billings.  *See* Letter from Charles Kelly, Assistant United States Attorney, to Special

FBI Agent, Def. FCA Mem. Ex. 42.  Dr. Prabhu was required to produce voluminous billing and

patient records to state and federal authorities.  For example, on one occasion, MFCU

subpoenaed "the full and complete medical records" for over four hundred patients of Dr.

Prabhu.  *See* Letter from Frankie Sue Del Papa, Attorney General, State of Nevada to Dr. Prabhu,

Def. FCA Mem. Ex. 43.

59.  With the Criminal Investigation in full swing, an FCA *qui tam* lawsuit was filed,

under seal, against Dr. Prabhu.  *See* Def. FCA Mem. Ex. 45.  The allegations of Medicare fraud

in the *qui tam* action included matters from the Criminal Investigation and matters that the press

had earlier disclosed.  To investigate the allegations in the *qui tam* action, the Government was

required to review Dr. Prabhu's Medicare and Medicaid billings.

60.  After investigating Dr. Prabhu's Medicare billings for approximately one year, the

Civil Division of the Department of Justice ("DOJ") elected to intervene in the *qui tam* lawsuit.

On July 1, 1993, the *qui tam* lawsuit was unsealed and a First Amended Complaint was publicly

filed against Dr. Prabhu.  *See* Def. FCA Mem. Ex. 46.  In its First Amended Complaint, DOJ

significantly revised the Original Complaint.  However, only one revision is relevant to the

present issue.  DOJ added an allegation that was specific to PFT's, as opposed to a general

allegation that Dr. Prabhu's office was improperly upcoding claims.  The Government alleged

that there was no medical necessity for Dr. Prabhu to perform the following tests: spirometry

tests; lung diffusion tests; functional residual capacity tests; and maximum breathing capacity tests. *Id.* at ¶ 26. The simple stress test was absent from this list of unnecessary "lung capacity tests."

61. In September 1994, DOJ informed the Court that it did "not intend to seek an indictment against Dr. Prabhu or his companies." *See* Def. FCA Mem. Ex. 48. Upon completion of the Criminal Investigation, however, DOJ renewed its FCA litigation against Dr. Prabhu. At that time, DOJ continued its meticulous review of Dr. Prabhu's PFT billings and corresponding medical records. *See, e.g.,* Sulzinger Aff., ¶ 13. [15] After additional, exhaustive discovery of Dr. Prabhu's medical records and billings, DOJ filed a Fourth Amended Complaint against Dr. Prabhu. *See* Def. FCA Mem. Ex. 51.

62. The Fourth Amended Complaint dropped the allegation that Dr. Prabhu had been billing for tests that were not reimbursable under Medicare. *See* Def. FCA Mem. Ex. 51. That allegation was dropped even though, during that time, Dr. Prabhu was billing for the simple stress test component of pulmonary rehabilitation. The Fourth Amended Complaint also made the allegations of fraud involving PFT codes specific. *See id.*, ¶¶ 32-38. Thus, after years of extensive investigations, discovery, and analysis of Dr. Prabhu's PFT billings and corresponding medical records, the only PFT billing codes remaining at issue were: 94010 (spirometry test); 94060 (bronchospasm evaluation); 94200 (maximum breathing capacity test); 94700 (arterial blood gas analysis); 82803 (laboratory code for analysis of blood gases); and, 36600 (arterial

---

[15] For example, the Government sought discovery of "all versions of any document used from 1986 to the present [i.e., April 22, 1995] by R.D. Prabhu or his medical practice to document those tests he wished the pulmonary . . . technicians to perform on patients . . . ." *See* United States of America's Fifth Set of Requests for Documents to R.D. Prabhu, M.D. *See* Def. FCA Mem. Ex. 50.

puncture to draw blood for diagnosis). [16]  The CPT Code list reflects that 94620, the simple

stress test code, was noticeably absent from this list.

      63.     DOJ was no longer alleging that Dr. Prabhu was billing Medicare for medically

unnecessary PFTs.  Rather, DOJ was alleging that Dr. Prabhu had improperly submitted

"unbundled claims" to Medicare. [17]  To make this amendment, DOJ was required to review the

medical records for all the PFT billing codes Dr. Prabhu submitted to Medicare to determine

whether the medical records supported the services that were being billed.  Since the simple

stress tests were being billed as a part of pulmonary rehabilitation services at that time, and since

the pulmonary rehabilitation services were clearly referenced in the medical records, DOJ would

have reviewed the simple stress tests/pulmonary rehabilitation claims in its search for any

alleged fraudulent billings. [18]  Despite this detailed review, the undisputed evidence shows that

DOJ never questioned the simple stress test claims.

      64.     After undergoing such an extensive and thorough review, on September 11, 1995,

DOJ – without receiving any payment as settlement – withdrew its intervention in the *qui tam*

lawsuit; *see* United States Withdrawal of Appearance, Def. FCA Mem. Ex. 52; thereby

---

[16] The parenthetical code descriptions were taken from the 1991 CPT.

[17] Unbundling occurs when a physician submits multiple codes to Medicare for procedures that are contained in a single code, thereby increasing their reimbursement.  For example, if there is a single code for setting a broken arm, a physician could not bill for that service by submitting the individual codes for x-rays, office visit, cast, pain medications, etc.

[18] As already noted through the attached Exhibits, the codes and medical records would have clearly indicated that Dr. Prabhu was providing pulmonary rehabilitation services and he was billing for the simple stress component of those services on the frequency of 2 to 3 times per week.

effectively acknowledging that its case lacked merit.

## CONCLUSIONS OF LAW

### *Summary Judgment Standards*

1.      Summary judgment is proper if there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

2.      Once this burden is met, Rule 56(c) mandates the entry of summary judgment unless the nonmoving party adduces evidence "sufficient to establish the existence of [each] element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id*. at 322.  The role of the court is to determine whether there is *sufficient* evidence so that a trier of fact could reasonably find in favor of the nonmoving party.  The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no ***genuine*** issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphases in original). Further, because "[i]t follows … that if the factual context renders respondents' claim implausible – if the claim is one that simply makes no economic sense - respondents ***must come forward with more persuasive evidence*** to support their claim than would otherwise be necessary."  *See Matsushit Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis supplied); *see also Eakins v. Nevada*, 219 F. Supp. 2d 1113, 1116 (D. Nev. 2002).

3.      To establish FCA liability, "the Government must prove three elements: (1) a 'false or fraudulent' claim; (2) which was presented, or caused to be presented, by the Defendant to the United States for payment or approval; (3) with knowledge that the claim was false."  *See United States v. Mackby*, 261 F.3d 821, 826 (9th Cir. 2001).  Here, the Government has failed to furnish sufficient evidence to establish any genuine material issue of fact so that a reasonable trier of fact could reasonably find in its favor that defendants knowingly submitted a false claim.  Accordingly, the Court grants summary judgment in the Defendants' favor and dismisses with prejudice the government's claims under the False Claims Act.

**Dr. Prabhu's Claims Cannot be False as a Matter of Law**

4.      Claims are not "false" under the FCA unless they are furnished in violation of some controlling rule, regulation or standard.  *See, e.g., United States ex rel. Local 234 v. Caputo Co.*, 321 F.3d 926, 933  (9th Cir. 2003); *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 674-75 (5th Cir.  2003) ("[W]hether a claim is valid depends on the contract, regulation, or statute that supposedly warrants it.  It is only those claims for money or property to which a Defendant is not entitled that are 'false' for purposes of the False Claims Act") (citation omitted) (en banc); *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1073-74 (9th Cir. 1998) (no falsity when Defendants' acts conformed with Veteran Administration payment guidelines); *United States ex rel. Lindenthal v. Gen. Dynamics Corp.*, 61 F.3d 1402, 1412 (9th Cir. 1995) (whistleblower's FCA claims for payment based on work that satisfied contractual obligations "could not have been 'false or fraudulent' within the meaning of the [False Claims Act]"); *United States ex rel. Glass v. Medtronic, Inc.,* 957 F.2d 605, 608 (8th Cir. 1992) (a statement cannot be "false" or "fraudulent" under FCA when the statement is consistent with regulations governing program).

5.      Additionally, claims are not "false" under the FCA when reasonable persons can disagree regarding whether the service was properly billed to the Government.  *See United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999) (holding that "errors based simply on faulty calculations or flawed reasoning are not false under the FCA … [a]nd imprecise statements or differences in interpretation growing out of a disputed legal question are similarly not false under the FCA") (citations omitted); *Hagood v. Sonoma County Water Agency,* 81 F.3d 1465, 1477 (9th Cir. 1996) ("How precise and how current the cost allocation needed to be in light of the [Water Supply Act's] imprecise and discretionary language was a disputed question within the [Government].  Even viewing [plaintiff's] evidence in the most favorable light, that evidence shows only a disputed legal issue; that is not enough to support a reasonable inference that the allocation was *false* within the meaning of the False Claims Act").

6.      Here, as to the two basic services that frame the dispute underlying the Government's lawsuit, pulmonary rehabilitation services and simple pulmonary stress tests, the record does not support a finding of falsity as a matter of law.  As to both services, there is no dispute regarding the facts.

7.      The Government's own expert agrees that pulmonary rehabilitation was covered by Medicare in various settings and in different jurisdictions.  *See* Dep. of Neil MacIntyre, M.D., at 14:1-16:17.  Additionally, both the Government's expert and the carrier's Medical Director further concurred that Medicare has always covered pulmonary stress tests when furnished as a component part of a pulmonary rehabilitation program.  *See* Dr. MacIntyre Dep. at 16:6-10; Dr. Mangold Dep. at 25:11-20; 26:1-12.  Dr. Mangold further confirmed that his office never issued a rule or policy that prohibited physicians from billing for pulmonary rehabilitation or its component services – such as pulmonary stress tests.  *See* Dr. Mangold Dep. at 12:4-14; 14:5-17.

In light of this, the Government has failed to prove that Dr. Prabhu violated a controlling rule, regulation or standard, for purposes of FCA liability.

8.      The Government has also failed to prove falsity as a matter of law, by failing to dispute the overwhelming evidence that Dr. Prabhu was following the instructions he received from his carrier in billing for pulmonary stress tests as part of his pulmonary rehabilitation program.  *See supra* ¶¶ 28-39.  The facts are undisputed that over a period of thirteen years, Dr. Prabhu and his associates continually contacted Medicare representatives to determine the appropriateness of their billing practices.  During that entire time, Medicare never advised Dr. Prabhu that it had revised or amended its policy or earlier instructions.  Medicare never advised Dr. Prabhu or his staff that its advice had changed, never transmitted any Medicare bulletins or flyers stating that its advice had changed or that his billing practice was prohibited, and never denied simple stress test claims that would have signaled to Dr. Prabhu that its advice had changed.

9.      The Government also failed to dispute the record evidence that Dr. Prabhu undertook efforts to ensure accurate coding.  *See* Falls Aff., ¶ 9 ("Dr. Prabhu was always adamant that all medical services must be documented, coded, and billed correctly"); Kanizai Aff., ¶ 7 ("I have worked in the healthcare field for approximately fourteen years, and I have never known a physician that is more dedicated and committed to doing everything correctly, including the coding and billing, than Dr. Prabhu"); Clark Aff., ¶ 16 ("Throughout the years that I have been processing claims for various physicians and medical practices, Dr. Prabhu is the most particular physician that I have known when it comes to making sure that everything is coded and billed correctly"); Kinkade Aff., ¶ 15 ("During the entire time that I have known Dr. Prabhu, I have never known him to bill a medical service to Medicare using a code that he did

not honestly believe to be correct and accurate in all respects"); Williams, Aff., ¶ 4 (Dr. Prabhu did not allow the Lung Institute to submit any claims to Medicare until all questions regarding the proper coding of that claim had been resolved through our discussions with Medicare"); Brown Aff., ¶ 7 ("During the entire time that I was employed by Dr. Prabhu, he was always a stickler for making sure that everything was done right, including the correct coding and billing of all procedures"); McKeon Aff., ¶ 8 ("Dr. Prabhu was always emphatic that every medical procedure or service must be coded and billed correctly"); Nelson Aff., ¶ 6 (same); Schiefer Aff., ¶ 15 (same); Sulzinger Aff., ¶ 15 (same); *see also* Atkins Dep. at 104:5-10 ("Q: In your opinion, does Dr. Prabhu try and bill Medicare to get as much as he can out of Medicare, or is he more concerned with the care of the patients? … A: The care of the patients").

10.     As to the government's contention that Dr. Prabhu's simple stress test was not properly billed because it did not include a pre and post-exercise spirometry and prescribed written report, the government's interpretation of the CPT Code for a simple stress test is wrong.

11.     The Government's contention that a physician must provide a pre and post-exercise spirometry is expressly refuted by the organization that published the billing code governing the provision of simple stress tests.  *See supra* ¶¶ 17-23.  The Government's own expert similarly concurs that  pre and post-spirometry is not required to bill for CPT 94620. Specifically, after being asked to review the Government's complaint and state whether he agreed or disagreed that a physician was required to perform a pre and post-exercise spirometry, the Government's expert stated that no such requirement existed.  *See* Dr. MacIntyre Dep. at 11:10-12:2.  In light of this, the Government has failed to prove falsity in claims by failure to include the spirometry tests.

12.     The Government's contention that a physician must provide a prescribed written report is also expressly refuted in the record.  It is clear from the facts and deposition of Dr. Mangold that no such requirement existed.  Dr. Mangold, the Medical Director of the carrier that processed Dr. Prabhu's claims, specified that it had published no policy mandating a specific type of physician written report that must accompany the provision of a simple stress test.  *See* Dr. Mangold Dep. at 23:2-6.  In light of this, the Government has also failed to prove falsity in claims by failure to include a written physician report.

13.     Finally, it is worth noting that in the Government's Response to the Defendant's FCA Motion, the government asserted an additional element to its claim that Dr. Prabhu did not perform all elements of a stress test.  *See* Gov't Response to Defendant's False Claims Act Motion at 7.  This third requirement- that dyspnea (i.e., whether the patient was short of breath) be measured- was a new one to this case at the time.  Notwithstanding the fact that it did not exist in the Government's complaint and thus should not be considered by the Court for that reason, the undisputed facts in this case reveal that Dr. Prabhu, in fact, *did* measure dyspnea. *See* Dr. Prabhu Dep., 87:7-88:5, Def. FCA Reply Ex: 1, Tab F; *see also* Ex. 1, at entry 6.

14.     For all these reasons, the Government has failed to demonstrate to this Court that Defendant's claims were false for purposes of FCA liability.

**Dr. Prabhu did not "Knowingly" Submit Any "False" Claim to the Government**

15.     For the reasons stated above, there is no proof that any of Dr. Prabhu's claims were false.  However, even if this Court were to have found that some claims were "false" under the FCA, the Government has proffered no material disputed fact that would demonstrate that Dr. Prabhu "knowingly" submitted a false claim.

16.     Under the FCA, a person is deemed to have acted "knowingly" when the person "acts in deliberate ignorance of the truth or falsity of the information; or acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b).  As the Ninth Circuit has pointed out, the FCA knowledge standard does not extend to honest mistakes, but only to "lies." [19]  Thus, a Defendant does not "knowingly" submit a "false" claim when his conduct is consistent with a reasonable interpretation of ambiguous regulatory guidance.  *See, e.g., United States ex rel. Swafford v. Borgess Med. Ctr.*, 98 F. Supp. 2d 822, 831-32 (W.D. Mich. 2000) (where the regulatory terms were undefined and ambiguous and the plaintiff's position "devolves to a dispute over the meaning of the terms governing the delivery of the professional component of physicians services . . . " there was no violation of the FCA because a "legal dispute is ... insufficient" to establish FCA liability), *aff'd,* 24 Fed. Appx. 491 (6th Cir. 2001); *United States v. Krizek,* 859 F. Supp. 5, 9–10 (D.D.C. 1994) (ruling that because the key term in the billing code was undefined and hence "ambiguous," the Government could not state an FCA cause of action), *aff'd in part, rev'd in part*, 111 F.3d 934 (D.C. Cir. 1997).

17.     Moreover, a Defendant does not knowingly submit false claims when he follows Government instructions regarding the claims.  *See United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321 (9th Cir. 1995); *Wang v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992) (where the Government knew of Defendant's "mistakes and limitations, and that

---

[19] *See Hagood*, 81 F.3d at 1478 ("requisite intent is the knowing presentation of what is known to be false, as opposed to innocent mistake or mere negligence").  Indeed, Congress specifically amended the FCA to include this definition of scienter, to make "firm . . . its intention that the act not punish honest mistakes or incorrect claims submitted through mere negligence."  *See also Hochman*, 145 F.3d at 1073 (quoting S. Rep. No. 99-345, at 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5272).  "Known to be false" does not mean scientifically untrue, it means "a lie."  *United States ex rel Anderson v. Northern Telecom, Inc.*, 52 F.3d 810, 815-16 (9th Cir. 1995) (internal citations and quotation marks omitted).

[Defendant] was open with the Government about them, suggests that while [Defendant] might have been groping for solutions, it was not cheating the Government in the effort").

18.     The undisputed record evidence demonstrates that Dr. Prabhu did not knowingly submit any false claims because his billing practice conformed to a reasonable interpretation of ambiguous regulations that he, and his staff, believed in good faith were proper. [20]

19.     Several facts underscore the regulatory ambiguity: (1) the Government never published a rule supporting its interpretation, for example, that to bill for a simple pulmonary stress test, the physician must perform a pre and post-exercise spirometry; (2) pulmonary rehabilitation has been covered continuously in various settings and its component parts, such as a simple stress test, has always been covered, *see supra* ¶¶ 6-16; (3) the Government's interpretation of the code has shifted dramatically during the course of this litigation and its own agents concur that the code is mired in ambiguity and confusion, *see supra* ¶¶ 25-27; (4) although the Government contends that Dr. Prabhu has committed fraud entitling it to tens of millions of dollars because he did not perform a pre and post-exercise spirometry, its own expert states that no such requirement exists and the Government's interpretation is further undermined by the organization that issued the code, *see supra* ¶¶ 17-23.  Moreover, there is undisputed

---

[20] *See United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 768-69 (8th Cir. 2002) (no violation of FCA intent standard because, even though administrators refrained from obtaining guidance regarding the questioned practice, they considered the billing practice to be an "acceptable standard procedure" and the relator did not produce any evidence "suggest[ing] anyone was lying to the Government" or "suspected something wrong"); *United States v. Data Translation, Inc.,* 984 F.2d 1256 (1st Cir. 1992) (when supplier's actions conformed with industry practice and were otherwise reasonable, the Government could not state a cause of action under the FCA); *United States ex rel. Perales v. St. Margaret's Hosp.*, 243 F. Supp. 2d 843, 866 (C.D. Ill. 2003) (defendant hospital did not bury "its head in the sand and wilfully [sic] ignore[] the law" when, among other things, there was "evidence that [it] received and considered relevant publications in this area of the law, established a corporate compliance committee, and routinely consulted counsel in drafting the contracts and agreements, which is suggestive of an intent to abide by the law"); *see also Krizek*, 859 F. Supp. at 9–10, *aff'd in part, rev'd in part*, 111 F.3d 934 (D.C. Cir. 1997); *United States v. Napco Intern., Inc.,* 835 F. Supp. 493, 498 (D. Minn. 1993) (because underlying regulation was ambiguous, the court would not permit the Government to apply "an interpretative afterthought by the agency" against the contractor in a FCA action).

evidence that Dr. Prabhu has always acted in good faith in seeking to understand the Government's rules.  *See supra* ¶¶ 28-40.  And finally, it is further illuminative that several of the Government's representatives have stated that this is an area rife with confusion.  *See* Dr. Mangold Dep. at 22:11-14; Dr. MacIntyre Dep. at 33:20-23; *see also supra* ¶ 27.

20.     The Government has similarly failed to prove knowledge as well, because Dr. Prabhu complied with Government instructions regarding the claims.  As the uniform and undisputed sworn testimony of Dr. Prabhu's staff in the record states, the carrier was fully aware of Dr. Prabhu's billing practice and, indeed, even advised that he bill for the test.  *See supra* ¶¶ 28-40; Atkins Dep. at 103:3-16. [21]

21.     Moreover, the Government became aware of Dr. Prabhu's practices during the course of its extensive criminal and civil investigation of him during the 1990s.  *See supra* ¶¶ 55-64.  As part of the investigation, Dr. Prabhu's Medicare claims, including his "PFT" claims such as the simple stress test, were closely reviewed.  *See, e.g.,* Sulzinger Aff., ¶ 5.

---

[21] *See United States ex rel. Costner v. URS Consultants*, 317 F.3d 883, 887-88 (8th Cir. 2003) ("The record shows that the EPA discussed these problems with the defendants and referred the matter to OSHA for investigation and possible sanctions.  Although the record indicates that the defendants' performance under the contract was not perfect, the extent of the Government's knowledge through its on-site personnel and other sources shows that … the Government knew what it wanted, and it got what it paid for . . . .  Thus, the district court did not err in finding that the defendants' openness with the EPA about their problems and their close working relationship in solving the problems negated the required scienter regarding these issues") (citation and internal quotation omitted); *United States ex rel. Becker v. Westinghouse Savannah River*, 305 F.3d 284, 289 (4th Cir. 2002) ("we join with our sister circuits and hold that the Government's knowledge of the facts underlying an allegedly false record or statement can negate the scienter required for an FCA violation" and hence the Government's "full knowledge of the material facts underlying any representations implicit in [the defendant's] conduct negates any knowledge that [the defendant] had regarding the truth or falsity of those representations"); *United States ex rel. David Bennett v. Genetics & IVF Inst.*, No. 98-2119, 1999 U.S. App. LEXIS 27911 (4th Cir. 1999) (although the defendant's contract mandated that, in conducting paternity testing, it conduct two tests, it informed the Government entity that it would perform only one test [since DNA testing was more accurate than the previously used serology testing] both before the contract was awarded and after it was awarded but before performance began; the court affirmed the district court's determination that no reasonable jury could conclude that the defendant had the requisite intent under the FCA because the Government knew of defendant's practices and had not objected); *see also Butler*, 71 F.3d 321 (concluding that where defendants openly shared all information with the Government and fully cooperated with it during the testing process, that the Government's knowledge defeats any inference that defendant "knowingly" presented false claims to the Government ); *Wang v. FMC Corp.*, 975 F.2d at 1421 (same).

22.     The record also reflects that additional litigation and discovery continued after DOJ filed its Fourth Amended Complaint in the previous investigation.  From the commencement of the Criminal Investigation, through the filing of the Fourth Amended Complaint, it is without question that Dr. Prabhu's medical and billing records underwent a very extensive and detailed fraud review.

23.     Under these circumstances, the court concludes that the Government cannot demonstrate that the Defendant knowingly submitted false claims.  It would be simply irrational for any person subjected to the level of scrutiny to which Dr. Prabhu was subjected to knowingly submit any claim that was questionable or borderline, let alone flat-out wrong.  *See supra* ¶¶ 55-64.

24.     As the regulatory history underlying pulmonary rehabilitation and simple pulmonary stress tests demonstrate, at worst, all that existed were disputed legal issues regarding whether pulmonary rehabilitation could be billed and under what circumstances the component parts of pulmonary rehabilitation, such as simple pulmonary stress tests, could be billed.  During the substantial period in which Dr. Prabhu billed for these services, there was a nationwide debate regarding when these pulmonary rehabilitation services could be billed.  *See supra* ¶¶ 6-16.  Congress authorized these services in a CORF setting, CMS authorized these services as part of NETT, various carriers expressly permitted physicians to bill for these services in an office setting, and Dr. Prahbu's carrier furnished no written instructions prohibiting the practice.  *Id.* Even when CMS later found that pulmonary rehabilitation was not a benefit category, it stressed that the component parts of the service were covered and CMS then promptly instituted new codes to cover pulmonary rehabilitation services.  *See supra* ¶12; *see also* 66 Fed. Reg. at 55,311; 67 Fed. Reg. at 79,999-80,000.  Courts have routinely ruled that where, at worst, all that

exists are disputed legal issues regarding whether a service was properly billed, the Government cannot prove falsity as a matter of law. [22]

25.     Accordingly, the Government has failed to establish that Defendants knowingly lied in presenting claims for simple stress tests to the Government.

### Dr. Prabhu's Claims Regarding Medical Necessity and Documentation Cannot Be False As A Matter Of Law

26.     When submitting healthcare claim forms, physicians certify that their services are "medically indicated and necessary for the health of the patient …"  *See* CMS-1500, *reprinted in* Medicare & Medicaid Guide (CCH) ¶ 10,26,1 Def. Med. Nec. Mem. Ex. 12.

27.     CMS has not delineated what constitutes "medically indicated" and "necessary" items or services furnished to Medicare patients and the specific documentation required to support medical necessity in individual cases.  *See, e.g.*, Medicare Program:  Criteria and Procedures for Making Medical Services Coverage Decisions That Relate to Health Care Technology, 54 Fed. Reg. 4,302, 4,304, 4,308, 4,312 (1989) ("current regulations are general and we have not defined the terms 'reasonable' and 'necessary,' nor have we described in regulations a process for how these terms must be applied").  In determining medical necessity, courts employ what is known as the "treating physician" rule, which provides that with respect to

---

[22] *See, e.g., Lamers,* 168 F.3d at 1018; *Swafford*, 98 F. Supp. 2d at 831-32 (where the relator had contended that, in order to bill for an "interpretation or reading" of the "results of the test" of ultrasound studies, the defendant physicians must do more than merely rely upon the findings of the technologist by independently reviewing the supporting data from which the technologist arrived at his conclusions, the court rejected the relator's claim because it found that those terms were undefined and ambiguous and that the relator's position "devolves to a dispute over the meaning of the terms governing the delivery of the professional component of physicians services" and that such a "legal dispute is … insufficient" to establish FCA liability because "a defendant's decision in the face of a dispute over the requirements of governing regulations is insufficient, without more, to constitute falsity"), *aff'd*, 24 Fed. Appx. 491 (6th Cir. 2001).  *Cf. In Re Genesis Health Ventures, Inc.*, 272 B.R. 558, 570 (Bkrtcy. D. Del. 2002) ("In this murky area in which no specificity exists in the statutory, regulatory or contractual scheme regarding the provision of credits, with no quest by either the state or federal Government for unpaid credit, either by way of the filing of proofs of claim or otherwise, there is insufficient basis to charge the debtors with the requisite scienter required to establish a factually false certification").

medical necessity, the judgment of the treating physician should be given "extra weight" or "a reasoned basis … [should be supplied] for declining to do so". *See, State of New York v. Sullivan*, 927 F.2d 57, 60 (2d Cir. 1991); *Klementowski v. Secretary*, 801 F. Supp. 1022, 1026 (W.D.N.Y. 1992); *Gartman v. Secretary*, 633 F. Supp. 671, 680-82 (E.D.N.Y. 1986) (noting that " '[t]he physician is to be the key figure in determining utilization of health services.' " (internal citation omitted).

28.     Here, based solely upon the undisputed material facts, the Government has not established sufficient evidence to demonstrate that Defendants furnished "false" claims regarding the medical necessity of the services they provided.

29.     First, the undisputed record indicates that the claims were, in fact, clinically medically necessary and indicated.  As delineated above, in the record entries of fourteen patients, Dr. Prabhu determined based upon his evaluation that the questioned patients would benefit from additional therapy.  *See* Dr. Prabhu Decl., ¶¶ 7-78.  The Government has failed to adduce any evidence that in light of the patient's complaint, symptom, and illness, that– from a clinical standpoint – the services were medically unnecessary.  Hence, because the certification provided on the claim form is literally true – there are no false claims as a matter of law.

30.     Dr. Prabhu's claims also cannot be false, as a matter of law, because, as previously mentioned, the Government has not established any violation of a controlling rule, regulation, or standard in Defendants' provision of pulmonary rehabilitation.  As the Government's expert readily acknowledged, Nevada did not have a governing LMRP setting forth the precise manner in which these services must be documented.  *See* Grider Dep., 20:8-25.  Additionally, as the Government conceded, the California LMRP does not furnish a controlling documentation

standard.  *See id.* at 25:18-21.  Accordingly, because there was no breach of any rule, regulation or standard, Dr. Prabhu's claims cannot be held false as a matter of law.

31.     Finally, Dr. Prabhu's claims cannot be false, as a matter of law, because under the undisputed facts there is no articulated, objective standard that dictates that the documentation underlying the claims is false, inaccurate, or incomplete.  Dr Prabhu's claims are not "false" – even assuming Ms. Grider's opinions were valid – because his documentation practices would fall within the range of reasonable medical and scientific judgment regarding how to document the medical necessity of pulmonary rehabilitation services.  *See* Dr. Prabhu Decl., ¶¶  7-79; Dr. Osei Decl., ¶ 6; Dr. Stewart Decl., ¶ 4; Dr. Manaker Dep. at 64:14-65:11.  To establish falsity under the FCA, it is not sufficient to demonstrate that the person's practices could have or should have been better.  Instead, plaintiff must demonstrate that an objective gap exists between what the Defendant represented and what the Defendant would have stated had the Defendant told the truth. [23]  *See Hagood*, 81 F.3d at 1477.  Accordingly, because, at a minimum, reasonable minds may differ regarding whether the documentation underlying Dr. Prabhu's claims satisfied some undefined standard, the Government has not establish falsity as a matter of law.

### Dr. Prabhu did not "Knowingly" Submit Any "False" Claim To The Government Regarding The Medical Necessity Of His Claims

32.     As mentioned above, under the FCA, a person is deemed to have acted "knowingly" when the person "acts in deliberate ignorance of the truth or falsity of the

---

[23] *See also*, *Anderson*, 52 F.3d at 815-16; *United States ex rel. Roby v. Boeing Co.,* 100 F. Supp. 2d 619, 625 (S.D. Ohio 2000) ("At a minimum, the FCA requires proof of an objective falsehood . . . .  Expressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false"); *United States ex rel. Boisjoly v. Morton Thiokol*, 706 F. Supp. 795, 810 (N.D.Utah 1988) ("[the certification] reflects an engineering judgment…It is clearly not a statement of fact that can be said to be either true or false, and thus cannot form the basis of an FCA claim"); *see generally, Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 731 (7th Cir. 1999).

information" or "acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b).

33.     Here, as is stated above, Dr. Prabhu did not violate any rule, regulation, or standard and it is undisputed that his services were clinically medically necessary and indicated. However, even if contrary to fact, the Government could establish some regulatory breach, this would be insufficient to create FCA liability.  This is because the FCA is not intended to be some wide-ranging statute to police all types of regulatory or contractual compliance.  *See, e.g., United States ex rel. Willard v. Humana Health Plan*, 336 F.3d 375, 381 (5th Cir. 2003) ("The False Claims Act does not create liability merely for a healthcare provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe") (citation omitted); *United States ex rel. Norbeck v. Basin Electric Power Cooperative*, 248 F. 3d 781 (8th Cir. 2001); *Lamers*, 168 F.3d at 1019-20; *Swafford*, 98 F. Supp. 2d at 828 (the "FCA is not an appropriate vehicle for policing technical compliance with administrative regulations"; mere violations of administrative regulations are not actionable under the FCA "unless the violator knowingly lies to the Government about them") (internal quotation omitted), *aff'd,* 24 Fed. Appx. 491 (6th Cir. 2001).

34.     Instead, as this Circuit has emphasized, to demonstrate that the claims are "known to be false" the Government must demonstrate that there were "lies" – and not merely a scientific or technical dispute.  For example, in *Wang v. FMC Corp.*, 975 F.2d at 1421, the plaintiff contended among other things, that Defendant's "engineering work" was of "low quality" and that its design was "faulty."  The Ninth Circuit ruled that these contentions could not serve as the basis for FCA liability.  The Court reasoned:

> Proof of one's mistakes or inabilities is not evidence that one is a cheat. . . .  Without more, the common failings of engineers and

> other scientists are not culpable under the Act. . . .  The weakest account of the Act's "requisite intent" is the "knowing presentation of what is known to be false."  [Citation omitted.]  The phrase "known to be false" in that sentence does not mean "scientifically untrue"; it means "a lie."  The act is concerned with ferreting out "wrongdoing," not scientific errors.  [Citation omitted].  What is false as a matter of science is not, by that very fact, wrong as a matter of morals.  The Act would not put either Ptolemy or Copernicus on trial. *Id.*

In applying this standard, and for the reasons mentioned above regarding undisputed evidence regarding medical necessity, the Government cannot establish that Defendants "knowingly" submitted "false" claims.

35.     The only factual issue that has been raised in relation to the medical necessity issue is how the need for services should have been documented.  Because those rules are ambiguous- compare Ms. Grider's opinion with Drs. Stewart, Osei and Manaker- there cannot be any FCA liability as a matter of law.  *See, e.g., Swafford*, 98 F. Supp. 2d at 831-32 (where the regulatory terms were undefined and ambiguous and the relator's position "devolves to a dispute over the meaning of the terms governing the delivery of the professional component of physicians services . . . " there was no violation of the FCA because a "legal dispute is ... insufficient" to establish FCA liability), *aff'd,* 24 Fed. Appx. 491 (6th Cir. 2001);  *Krizek,* 859 F. Supp. at 9–10 (ruling that because the key term in the CPT code was undefined and hence "ambiguous," the Government could not state a FCA cause of action), *aff'd in part, rev'd in part*, 111 F. 3d 934 (D.C. Cir. 1997). [24]

---

[24] *See also Napco*, 835 F. Supp. at 498 (because underlying regulation was ambiguous, the court would not permit the Government to apply "an interpretative afterthought by the agency" against the contractor in a FCA action); *cf. In Re Genesis Health Ventures, Inc.,* 272 B.R. 558, 570 (Bkrtcy. D. Del. 2002) ("In this murky area in which no specificity exists in the statutory, regulatory or contractual scheme regarding the provision of credits, with no quest by either the state or federal Government for unpaid credit, either by way of the filing of proofs of claim or otherwise, there is insufficient basis to charge the debtors with the requisite scienter required to establish a factually false certification").

36.     Moreover, Defendants' conduct, applying to only a small percentage of all claims was, at worst, inadvertent, which does not trigger FCA liability.  Here, the Government has not questioned the documentation related to approximately 94.5% of all patients.  While Defendants contend that their documentation was adequate, the existence of such a low alleged error rate disproves the contention that Defendants "knowingly" engaged in a pattern of submitting false or fraudulent claims that would entitle the Government to treble damages and substantial civil fines. *See, e.g., United States ex rel. Watson v. Connecticut Gen. Life Ins. Co.*, No. 98-6698, 2003 U.S. Dist. LEXIS 2054 at *55 (E.D. Pa. Feb. 11, 2003) (rejecting the plaintiff's contention that the Defendant submitted false claims when 98.6% of the claims were correctly processed because the "high rate of accuracy undermines any contention that [the Defendant] knowingly engaged in a pattern of failing . . . " to adhere to the governing standard regarding claims submission), *aff'd* 87 Fed. Appx. 257 (3d Cir. 2004).

37.     At worst, such an allegedly low error rate (even if true) reflects inadvertence or honest mistake, which does not trigger FCA liability.  *See Hochman*, 145 F. 3d at 1074 (rejecting plaintiff's FCA allegations that physicians at a Veterans Health Administration clinic violated the FCA because, among other things, they hired unnecessary personnel because Defendants believed that the additional personnel was needed to advance the clinic's interest and that since "at best plaintiffs ha[ve] only shown an innocent mistake or mere negligence . . . ," their FCA action was dismissed); *see also Madonna Towers, Inc.,* 278 F.3d at 767 ("innocent mistakes and negligence are not offenses under the Act") (internal quotation and citations omitted);  *Mikes v. Straus*, 274 F.3d 687, 703 (2d Cir. 2001) ("the requisite intent is the knowing presentation of what is known to be false as opposed to negligence or innocent mistake") (internal quotation and citations omitted); *see also Hindo v. Univ. Of Health Sciences/The Chicago Med. Sch.*, 65 F.3d

42

608 (7th Cir. 1995) (no violation of the FCA because Defendant had a good faith belief that it was entitled to payment for the services performed by residents); *In re Cardiac Devices* Qui Tam *Action*, 221 F.R.D. 318, 339 (D. Conn. 2004) ("The Second Circuit has adopted the Ninth Circuit's standard that the 'requisite intent is the knowing presentation of what is known to be false' as opposed to negligence or innocent mistake") (citation omitted); *Swafford*, 98 F. Supp. 2d at 832 (under FCA standard, the "plaintiff must adduce facts that establish more than mere innocent mistakes or negligence on the part of Defendants") (citation omitted), *aff'd,* 24 Fed. Appx. 491 (6th Cir. 2001).

38.     Finally, the Government's case "makes no economic sense," *Zenith Radio Corp.*, 475 U.S. at 587, because the undisputed evidence shows that Dr. Prabhu lost money in providing these services.  *See* Def. Unjust En. Mem. ¶¶ 6-10.  Hence, Dr. Prabhu had no monetary incentive to furnish more pulmonary rehabilitation than was medically indicated and necessary and the Government's evidence – that documentation standards can be debated – cannot satisfy the test in *Zenith* requiring that when the nonmoving party's claim is economically implausible that it "come forward with more persuasive evidence to support [its] claim than would otherwise be necessary."  *Zenith Radio Corp.*, 475 U.S. at 587.

### Unjust Enrichment

39.     To establish liability for unjust enrichment, the Government must prove (1) the Government conferred a benefit on the defendant, (2) the defendant retained and appreciated the benefit, and (3) retention of the benefit by defendant under the circumstances would be inequitable. *Leasepartners Corp. v. Robert L. Brooks Trust,* 113 Nev. 747, 755, 942 P.2d 182, 187 (1997); *United States v. Lahey Clinic Hospital,* 399 F.3d 1, 8, 16 n. 17 (1st Cir. 2005).

40.     Defendants do not contest that the Government has established the first of these three elements, the conferring of a benefit on defendants. The Government's Medicare reimbursement payments to defendants satisfy this element.

41.     As to the final two elements of the unjust enrichment analysis, the Court finds that even if Dr. Prabhu retained and appreciated a benefit, such retention is equitable given the Court's ruling on Dr. Prabhu's other Motions for Summary Judgment (#40, #41).  Otherwise, the Court's ruling would be internally inconsistent.  As detailed above, Dr. Prabhu is entitled to judgment as a matter of law on both the "knowledge" and "falsity" elements of the False Claims Act.  Accordingly, the Court must also find that his retention of benefits is equitable.  Because Dr. Prabhu is entitled to summary judgment with respect to the False Claims Act, his retention of any benefit cannot constitute unjust enrichment as a matter of law.  Having already determined that Dr. Prabhu's Medicare claims were justified under the False Claims Act, the Court cannot find as a matter of law that the retention of benefits arising there from is inequitable.  Therefore, the Court finds that Dr. Prabhu is entitled to summary judgment on the Government's claim for unjust enrichment.

**Conclusion**

The Government has failed to establish a genuine issue of material fact concerning its allegations that Dr. Prabhu violated the False Claims Act.   Accordingly, Defendant's motions for Summary Judgment as to the False Claims Act and Medical Necessity (#40, #41) are GRANTED.

Defendants' motion for Summary Judgment as to Unjust Enrichment (#42) is also GRANTED.

DATED:  July 19, 2006.

_____
ROBERT C. JONES
UNITED STATES DISTRICT JUDGE